*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-237

DECEMBER TERM, 2014

| | |
|---|---|
| In re D.C., Juvenile | }     APPEALED FROM: |

APPEALED FROM:

Superior Court, Caledonia Unit,
Family Division

DOCKET NO. 124-10-12 Cajv

Trial Judge: M. Kathleen Manley

In the above-entitled cause, the Clerk will enter:

Mother appeals a decision of the superior court, family division, terminating her parental rights with respect to her daughter, D.C. We affirm.

The following family court findings are supported by the record. Mother has experienced much trauma in her life. As a teen, she was in the custody of the Department for Children and Families (DCF). Since her teenage years, she has struggled with addiction to various substances, including heroin, cocaine, alcohol, and marijuana. During that time, she has engaged in several residential programs and experienced varying lengths of sobriety. She experiences mood swings and has limited anger management skills, resulting in frequent emotional outbursts and at times violent interactions with others. She has been diagnosed as having Post-Traumatic Stress Disorder (PTSD), Bi-Polar Disorder, and, more recently, Borderline Personality Disorder. She has been prescribed medications to assist in moderating her moods, with varying degrees of success. As a result of her mental-health challenges and her ongoing use of substances, she voluntarily relinquished her parental rights to her two older children in 2007.

Mother and D.C.'s father have been together off and on since they met in a residential treatment facility sometime in 2009 or earlier. When both are sober and following prescribed mental health plans, the relationship is more stable. Otherwise, the relationship is unstable and fraught with substance abuse and violence. Each of them has been convicted of assaulting the other during the four years preceding the termination hearing.

D.C. was born in January 2011. DCF became involved with the family shortly after D.C.'s birth because of her parents' relapse with substances, their mental-health struggles, and mother's history with her two older children. In March 2011, the court issued an emergency conditional custody order that continued custody with the parents as long as specified conditions were met. Services were provided to help the parents achieve sobriety, stabilize their emotional health, and care for D.C. In August 2011, the court issued an emergency-care order that removed D.C. from the parents' care as the result of their continued substance abuse and mother's escalating emotional upheavals, which created a potentially unsafe environment for D.C. D.C. was placed with the father's sister and her husband. In December 2011, D.C. was

placed back with her parents under another conditional custody order. In March 2012, that later order was vacated, full custody was returned to the parents, and the case was closed.

By the end of the year, D.C. was back in DCF custody. During the fall of 2012, DCF received a report that both parents were abusing alcohol, both were engaging in significant emotional outbursts due to untreated mental-health issues, and mother had been in a fight while intoxicated. Upon further investigation, DCF learned that the father had been arrested for felony assault against mother in their home. At the time of the assault, the child was in the home but not in the room where the assault occurred. When a DCF social worker attempted to contact mother to ensure that the child was safe, mother became agitated and threatened to take D.C. out of state. D.C. was taken into DCF custody on October 29, 2012 and again placed with the father's sister and husband. Services had already been identified in the earlier case, and mother had been engaged off and on with mental-health services. DCF set up Family Time Coaching for both parents.

On January 3, 2013, the parents signed a merits stipulation, agreeing, by clear and convincing evidence, that D.C. was a child in need of care or supervision because she was without proper parental care necessary for her well-being. The findings in the stipulation detailed the parents' struggles with substance use, violence, and their untreated mental-health issues. The stipulation stated that D.C. was a child without proper parental care necessary for her well-being because of the risks associated with: (1) D.C. being in the home when the father assaulted mother; (2) D.C. being present when one or both parents were under the influence of alcohol and/or marijuana; (3) one or both parents not treating their diagnosed mental illnesses; and (4) mother's threat to abscond with D.C. The initial case plan, filed two weeks later, recommended continued DCF custody as the parents worked on identified areas of need, and set concurrent goals of reunification with either parent or adoption. At that time, D.C. had just turned one year old.

A contested disposition hearing was held on February 14, 2013. At the conclusion of the hearing, the court made oral findings and conclusions, adopted the case plan, and continued DCF custody with concurrent goals of reunification or adoption. In relevant part, the disposition plan of services called for mother to: (1) consistently communicate with DCF; (2) maintain stable housing; (3) attend all family team meetings, case plan reviews, and court hearings; (4) continue to engage in substance abuse counseling; (5) successfully engage in dialectical behavior therapy (DBT) at Northeast Kingdom Human Services (NKHS); (6) submit to random drug testing; (7) permit DCF to make unannounced home visits; (8) engage in individualized Family Treatment Court style case management with Easter Seals; (9) actively work with Easter Seals coaches to address parenting skills; (10) complete the referred parenting court/support group offered by Prevent Child Abuse Vermont; and (11) sign and maintain all releases to allow DCF to verify progress with the case plan.

Meanwhile, mother had been engaged in Family Time visits with D.C. Because of her progress, contact was increased to include a play group after Family Time and unsupported time with D.C. By the end of February 2013, mother had D.C. with her Sunday overnight until Monday evening. The Family Time case was closed for mother on March 8, 2013. Three days later, the father's sister, the foster mother, arranged for a relative to care for D.C. and emailed DCF to ask them to tell mother not to call the house because she would not be home. The sister did not communicate with mother directly because she was afraid of her due to past incidents between them. The message that the sister left for DCF never reached mother, who wound up

2

calling the sister's home twenty to thirty times in the course of ten minutes, leaving threatening and vulgar messages on the answering machine. Also, in February 2013, mother was charged in two criminal actions, one for simple assault of a roommate and the other for violation of a relief-from-abuse order obtained by mother's sister. The charges, which DCF did not learn about until later, were both resolved by plea bargain in September 2013. The father began seeing mother again regularly despite a "no contact" order in effect through his conditions of release.

In late March 2013, DCF changed the case plan goal to adoption. The goal was changed with respect to mother because D.C. was in DCF custody for a second time at a very young age; mother was still drinking alcohol and smoking marijuana; she was unable to consistently apply skills from counseling to regulate emotional outbursts, as evidenced by the recent criminal charges against her; she was seeing the father regularly, despite her acknowledgement that he was a trigger for her use of substances and emotional outbursts; DCF received a psychological evaluation of mother outlining the challenges to managing her specific mental-health needs in relation to D.C.'s need for stability; and because of the parties' history of on-again off-again engagement with services and compliance with case-plan recommendations. The psychological evaluation, which was prepared for DCF by Dr. William Nash and filed in March 2013 identified the following areas of concern: (1) mother's decision to reunite with the father in what had been a dysfunctional and at times violent relationship over a period of years; (2) the level of her mental-health issues, for which her prognosis was guarded to poor; and (3) her ongoing substance use.

In June 2013, DCF filed a petition to terminate the parents' parental rights. When the parents moved back in together in the summer of 2013 after father's no-contact order had been lifted, mother's ability to regulate her emotional disruptions deteriorated. Mother's unsupervised contact with D.C. was suspended in late July 2013 following her emotional outburst at a meeting, which resulted in the police being called. By the end of August 2013, as the direct result of her outbursts and threatening behavior, mother lost all contact with D.C. for six weeks until supervised contact could be set up at a visitation center.

The termination hearing was held over six days between October 2013 and January 2014. Following the hearing, the court terminated both the father's and mother's parental rights. Only mother has appealed that decision. In terminating mother's parental rights, the court first determined by clear and convincing evidence that there had been a substantial change of circumstances since the disposition order. The court found that, despite years of counseling, mother was still in the early stages of focusing on treatment necessary to address her mental-health needs. According to the court, she was never able to sustain any improvement in her mental health for more than a few months, in part because she did not consistently take advantage of her supports, medications, and skills learned in counseling. Turning to the best-interest factors, the court acknowledged that D.C. and mother have a close bond, and that when mother was sober and fully engaged in mental-health treatment, D.C. had always been well cared for in terms of hygiene, clothing, and appropriate interactions. But the court noted that periods of total chaos followed periods of calm when the parents used substances, ceased their medications, and failed to follow through with their mental-health treatment. The court concluded that such a dynamic created a harmful environment for D.C. in that it raised concerns for the child's physical safety and emotional well-being and it hampered the child's ability to develop into a healthy adult. The court concluded that although mother continued to play a constructive role in D.C.'s life through visits, D.C.'s need for a permanent, stable, and safe home at her young age compelled termination of mother's parental rights, given the unlikelihood that

mother would be able to resume care of D.C. within a reasonable period of time from the perspective of the child.

Mother appeals, arguing that: (1) the court's finding that her parenting ability had stagnated was not supported by the evidence, which showed that she posed no threat to D.C.'s developmental progress and that she was committed to change and making progress; (2) the court's conclusion that mother would be unable to resume her parenting duties within a reasonable period of time was erroneous because the court misapprehended the nature of certain testimony and mother's ability to parent; and (3) even if the court's findings are affirmed, its weighing of the best-interest factors was both erroneous and an abuse of discretion.

A court considering modifying a previous order by terminating parental rights must conduct a two-step analysis in which it determines first whether there has been a substantial change of material circumstances, see 33 V.S.A. § 5113(b), and second, if so, whether the best interests of the child require termination of parental rights, considering the statutory criteria set forth in 33 V.S.A. § 5114(a). In re Cr. M., 163 Vt. 542, 545-46 (1995). A substantial change of circumstances is most often found in situations where the parent's ability to care for the child has either stagnated or deteriorated over time. Id. Stagnation may be demonstrated where any improvement in parenting ability "is so insignificant that it is unlikely the parent will be able to resume parental duties in a reasonable time." In re J.G., 2010 VT 61, ¶ 10, 188 Vt. 562, 563-64 (mem.) (quotation omitted).

Mother first argues that it was clear error for the court to conclude that her parenting ability had stagnated because the evidence demonstrated that she was able to regulate her emotions around D.C. and that she had made progress toward regulating her emotions in other settings. According to mother, at most, the evidence demonstrated that she continued to have difficulty regulating her emotions around those whom she believed threatened her relationship with her child, but there was no evidence that her ability to manage her emotions around D.C. ever regressed. In support of this argument, she cites the court's findings that she had positive interactions with D.C. during visits and continued to play a constructive role in her life.

We conclude that the record supports the court's determination that mother's ability to care for D.C. had stagnated. The trial court's findings detail many undisputed instances of mother's ongoing emotional outbursts and threatening behavior. These instances continued to occur through the summer and fall of 2013 before the termination hearing. They continued to occur because, as the court found, mother had been inconsistent in addressing her significant mental health issues and is still in the early stages, despite years of counseling, of focusing on the treatment necessary for her to address the underlying trauma that is at the root of her mental health problems. We concur with the court's rejection of mother's contentions that her emotional outbursts are attributable principally to DCF involvement in her life and can be separated from her ability to parent D.C. As the court pointed out, DCF personnel were not involved when mother assaulted a friend, violated a relief-from-abuse order, threatened the foster mother, accused the Family Time coach of flirting with the father, and got in altercations with the father. The court also noted that D.C. was in the home when the father assaulted mother and in the car with mother and the father when the father was driving intoxicated. Although in those two particular instances the father was the aggressor and the driver, violence and the use of substances have been ongoing issues for both parents. The court credited Dr. Nash's testimony that Borderline Personality Disorder, one of mother's diagnosed mental-health conditions, has a significant impact on parenting skills because borderline personalities, by definition, quickly

4

change for no apparent reason, and children need reliability and predictability to thrive and develop. In short, the court did not err in rejecting mother's improbable suggestion that her significant mental-health issues, which have resulted in recurring emotional outbursts and occasional acts of violence, can somehow be isolated from her care of D.C. The record amply supports the court's determination that mother had not made significant progress in addressing the issues that led to DCF custody of D.C.

Mother argues, however, that even if her emotional reactions to others impacts her ability to parent D.C., there was ample evidence that she had worked consistently to manage her symptoms and had in fact reached a point where she "was even ready to begin the heavy lifting to address her underlying trauma." In support of this argument, mother cites the testimony of her therapist that her missed treatment sessions were not indicative of the progress she had made in counseling. We find this argument unavailing. The court found based on the testimony of expert witnesses—and, indeed, mother herself acknowledges—that she has not yet begun addressing the underlying trauma that will help her overcome the symptoms of her mental-health illnesses. As the court repeatedly pointed out, because of D.C.'s young age and her extended time in DCF custody, the disposition report anticipated a relatively short period of time—approximately six months—for mother to demonstrate significant progress toward being able to provide D.C. a safe and stable home. Mother's limited progress over a much longer period plainly amounted to a change of circumstances by stagnation.

Mother's second principal argument is that the court erred in concluding that she would be unable to resume her parental duties within a reasonable period of time because its findings that her instability threatened D.C.'s development and presented a risk of physical and emotional harm are clearly erroneous. In support of this argument, mother reasserts her claim that her emotional outbursts and tendencies toward threatening and violent behavior have never been directed at D.C. On the one hand, mother contends that she has made a lot of progress and is not in the early stages of treatment, but then cites expert testimony that she could "begin" addressing underlying trauma issues after the stress of the termination case passes. The record amply supports the trial court's findings that, despite years of counseling, mother is still at the early stages of focusing on treatment necessary to address her mental health needs, and has not been able to remain stable long enough to allow her to safely address the underlying trauma issues identified long ago. As the trial court noted, the expected goal date of July 2013 in the initial case plan contemplated that the parents would engage and progress quickly with respect to the issues that gave rise to the CHINS judgment.

Mother further asserts that the court refused to decide which expert, Dr. Nash, who testified on behalf of DCF, or Dr. Kinsler, who testified on mother's behalf, was more credible. We disagree. The court cited and assessed the testimony of both doctors, both of whom agreed that mother had significant mental-health issues. Moreover, the court cited in detail the testimony of mother's counselor, her therapist, and Dr. Kinsler acknowledging that mother had not yet begun to engage in therapy that would address the underlying trauma that was at the root of her mental-health illnesses.

Lastly, mother argues that even if the court correctly concluded that there were changed circumstances and that she would not be able to resume her parental duties within a reasonable period of time, its termination decision should still be reversed because the court itself found that she played a constructive role in the D.C.'s life and has a close bond with D.C. According to mother, because the court acknowledged that D.C. would suffer from a loss of contact with

5

mother upon termination of mother's parental rights, its termination decision would cause the exact harm that the court purported to avoid. Mother asserts that, in effect, the court was choosing the foster home simply because the court believed that D.C. might be better off there than with mother. See In re N.H., 135 Vt. 230, 236 (1977) ("The statute certainly does not allow for intervention simply because a child might be better off somewhere else."). We find no merit to this argument. The undisputed evidence is that D.C. is a very young child in need of a safe, stable, and permanent home. Such a home has been provided by the foster family for a significant period of time in the child's young life. In contrast, although mother has played a constructive role in D.C.'s life through visits, despite numerous services she has not successfully addressed the issues that resulted in her losing custody of D.C. She has not yet begun therapy focused on the underlying trauma that contributes to her mental-health issues, and to repeated incidents demonstrating her emotional instability. Further, she got back together with the father, despite her acknowledgement that they trigger in each other the behaviors that increased the chaos in their lives and posed risks to D.C. This situation cannot be characterized as the court simply choosing what it perceived to be a better home for D.C.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice